# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AZZA EID; AMRE R. GINENA; NAHID
I. GINENA; REDA A. GINENA;
SABRINA KOBERT; M. SAMIR
MANSOUR; NAZMI M. NAZMI; M.
MAGDY H. RASIKH; HEBA NAZMI,
        *Plaintiffs-Appellants,*

       v.

ALASKA AIRLINES, INC.,
        *Defendant-Appellee.*

No. 06-16457

D.C. No.
CV-04-01304-RCJ

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, District Judge, Presiding

Argued and Submitted
April 18, 2008—San Francisco, California
Submission Vacated April 23, 2008
Resubmitted July 30, 2010

Filed July 30, 2010

Before: Alex Kozinski, Chief Judge, N. Randy Smith,
Circuit Judge and S. James Otero, District Judge.*

Opinion by Chief Judge Kozinski;
Partial Concurrence and Partial Dissent by Judge Otero

---

*The Honorable S. James Otero, United States District Judge for the
Central District of California, sitting by designation.

10957

## COUNSEL

Gilbert Gaynor (argued), Santa Barbara, California, John F. McHugh, New York, New York, and Allen Lichtenstein, Las Vegas, Nevada, for the plaintiffs-appellants.

Beth S. Brinkman (argued) and Seth M. Galanter, Morrison & Foerster, LLP, Washington, D.C., Carrie McCrea Hanlon, Pyatt Silverstri & Hanlon, Las Vegas, Nevada, and Don G. Rushing, William V. O'Connor and Ellen Nudelman, Morrison & Foerster LLP, San Diego, California, for the defendant-appellee.

Stephen B. Mashney, Mashney Law Offices, Anaheim, California, for amicus curiae American-Arab Anti-Discrimination Committee.

Jonathan A. Cohen and James W. Johnson, Air Line Pilots Association, International, Herndon, Virginia, for amicus curiae Air Line Pilots Association, International.

Robert McGeorge and Poolust N Udai Fulena, International Air Transport Association, Washington, D.C., and Andrew J.

Harakas, Diane W. Wilson and Barry S. Alexander, Clyde & Co. US LLP, New York, New York, for amicus curiae International Air Transport Association.

David A. Berg and Katherine Andrus, Air Transport Association of America, Inc., Washington, D.C., and Constance O'Keefe, Squire, Sanders & Dempsey LLP, Washington, D.C., for amicus curiae Air Transport Association of America, Inc.

Gregory G. Katsas, Michael S. Raab and Sarang Vijay Damle, U.S. Department of Justice, Washington, D.C., for amicus curiae United States of America.

Tarik S. Adlai, Law Offices of Tarik S. Adlai, Pasadena, California, for amicus curiae Arab Republic of Egypt.

---

## OPINION

KOZINSKI, Chief Judge:

We consider when airlines may be held liable to passengers on international flights whom they force to disembark before the voyage is completed.

### Facts

These are the facts as plaintiffs allege them: On September 29, 2003, a group of Egyptian businessmen, their wives and a Brazilian fiancée, boarded Alaska Airlines Flight 694 in Vancouver, British Columbia. Their journey had started a few days earlier in Cairo and they were headed for a convention on energy-related products and services in Las Vegas. The Egyptians were interested in becoming distributors of natural gas equipment manufactured by a Texas company and, to that end, had scheduled a meeting with officials of that company who were attending the convention.

The nine plaintiffs took up all but three of the first class seats on Flight 694. A tenth passenger was Kimberlie Shealy, an American; she sat next to plaintiff Magdy Rasikh, whom she described as "[a]n Egyptian gentleman" with whom she "was having a pleasant conversation." Shealy Declaration at ¶¶ 2, 5. According to Shealy, who provides the only independent account of the incident, the flight attendants treated the Egyptians badly. It started "[e]arly in the flight" when Shealy "heard some comment by the young man in row one [plaintiff Amre Ginena] about coach passengers using the first class bathroom to a young blonde flight attendant [apparently Dalee Callaway]. She said something in response but I could see by her face that she did not like the question. I was surprised by her obvious reaction . . . ." *Id.* at ¶ 4.

About an hour into the flight, Reda Ginena, who was in the front row with his wife and son, stood up to stretch. Shortly thereafter, a second flight attendant, Lee Anne Maykuth, asked him to sit because standing was not permitted right outside the cockpit. Ginena, who was in his 60s, explained that he needed to stretch periodically because back and circulation problems made protracted sitting extremely painful. Maykuth said he could stand at the rear of the first class cabin, near the partition between first class and coach.

Ginena moved to that location, but soon after the third flight attendant, Robin Duus, came up from coach and ordered Ginena to sit down, using what Shealy described as "an unpleasant loud voice."[1] Shealy Declaration at ¶ 6. According to Shealy, "[i]t was obvious from body language that [Duus] . . . was not in a good mood from the beginning

_____

[1] As Ginena describes it: "Suddenly another flight attendant was speaking to me and very harshly told me to sit down immediately. She said that I had been asked to sit by her colleague and I had ignored her. I replied that her colleague had indeed told me that I could stand at that location. She again ordered me to sit down in a loud firm voice." Ginena Declaration at ¶ 11.

of the flight." *Id.* at ¶ 5. "[S]he had been glaring at [the Egyptian] group every time she passed through the first class cabin. She wasn't looking at me like that." *Id.* at ¶ 6. Duus claims that at the beginning of the flight Reda Ginena made "a put down to [my] intelligence and my roll [sic] as an authority figure" by asking a scientific question. Duus refused to answer Ginena's question because it "wasn't really pertinent to anything. It was just an interruption." Duus might also have been upset because, immediately before the flight, the airline had given her a Notice of Discipline or Discharge.

After Duus asked him to sit, Ginena immediately took his seat but Duus continued to hector him: "She wanted to reiterate the fact that he was not supposed to be in the aisle."[2] Shealy Declaration at ¶ 7. Ginena responded, "I am sitting down," and Duus "then gave them a piece of paper and insisted that they fill it out. The older gentleman [Ginena] looked shocked." *Id.* The form in question was a Customer Inflight Disturbance Report; it was designed to be filled out by flight crew, not passengers.[3] Ginena's son asked what the form was. According to Ginena, "[Duus] yelled at [my son] to 'zip it up, end of discussion' . . . ." Ginena Declaration at ¶ 13.

Ginena the elder eventually figured out that the form was actually supposed to be filled out by Duus, and tried to tell her

---

[2]Ginena recalls: "As I walked she was behind me and was still talking at me. I do not remember what she was saying but her tone was nasty." Ginena Declaration at ¶ 11.

[3]Alaska Airlines's Flight Attendant Manual calls for notification of the captain and his concurrence before a written notification may be given to a passenger. The flight attendants on Flight 694 did not do this, handing out the forms on their own. The manual also explains that only the bottom part of the form, which consists of a pre-printed notice, is to be given to the passengers. The top portion—the one with all the blanks for names, times, witnesses, etc.—is to be retained by the flight attendant and filled out by the crew. There is nothing in the manual or elsewhere that requires passengers to fill out anything.

so.[4] In response, Duus "went ballistic and began pacing between the first row and the galley and yelling. She was completely irrational, [Ginena] and his son could not get a word in." Shealy Declaration at ¶ 7. Shealy also reports that, "[e]ven at the height of the argument the people in row one were respectful to the flight attendant to the extent that they could be under the circumstances."[5] *Id.* at ¶ 15. She "saw no

---

[4]This is Ginena's account:

> By that time I had reviewed the form. It had no place for a passenger's statement or signature. It is to be filled out by the flight attendant and the captain, not by a passenger. I told [Duus] that I was not to fill out or sign that form. At that she began to yell at me. She told me that I was in violation of federal law and would go to jail. She became absolutely irrational and I simply could not follow what she was saying. She was literally screaming at me. My wife then told her that she could not talk to passengers that way and that we could not understand what she was trying to tell us when she was screaming. The flight attendant screamed at my wife pointing her finger at her telling her "I will show you what I can do to you" or words to that effect. The flight attendant walked to the galley and immediately came back and presented my wife with the same form, shouting that she also fill it out and sign it, adding that she will see to it that we all go to jail. She then walked a few feet to the bulkhead by the exit door and picked up a phone which was there. She literally screamed into the phone that she had lost control of the first class cabin and that the aircraft had to be landed immediately.

Ginena Declaration at ¶ 14.

[5]Plaintiffs fully corroborate this observation. Ginena explained:

> At all times while the flight attendant was yelling no one else was yelling or speaking as loud. Indeed, only my wife even attempted to make herself heard over the flight attendant's yelling but she gave up quickly. I gave up when she began to yell as it was clear to me that she was irrational and that effective communication was impossible. My son also said nothing to Ms. Duus after telling me not to sign anything immediately after receiving his own copy of the customer disturbance form.

Ginena Declaration at ¶ 16. Same for M. Samir Mansour:

> Sometime later I awoke to shouting. It turned out to be a flight attendant who was on a phone standing by the door of the galley

sign that any person in the first class section was drunk, nor did [she] observe any misconduct of any kind" on the part of the passengers. *Id.* at ¶ 3. According to Shealy, the Egyptian passengers "were being accused of something that they clearly did not understand and were being humiliated before the entire aircraft as the flight attendant [Duus] was yelling at the top of her lungs." *Id.* at ¶ 8.

Mrs. Ginena then told Duus that she couldn't treat passengers this way, to which Duus responded "I will show you what I can do to you" and thrust another form into her hands. Ginena Declaration at ¶ 14. Soon afterwards, according to Shealy, "the flight attendant [Duus] said 'that's it I'm taking this plane down[.'] All discussion and loud voices stopped. She went and got a phone and was standing for a second in the middle of the aisle by the galley," and soon thereafter the plane started "a quick descent." Shealy Declaration at ¶¶ 9-10.

When Duus called the cockpit, she announced that she had "lost control of the first-class cabin." Swanigan Deposition at 96.[6] Captain Michel Swanigan and First Officer James Rob-

---

ahead of the first class section. She was telling someone on the other end of the phone line to land the aircraft as she had lost control of the first class cabin. I could see the entire first class cabin as I was in row three of the three-row section. Everyone was sitting and no one but the flight attendant was speaking.

Mansour Declaration at ¶ 6. And Magdy Rasikh:

As my seat-mate, a young lady from Las Vegas who was unknown to me prior to that flight, says in her declaration, the three members of my party involved at all were simply attempting to respond to the flight attendant who, according to Ms. Shealy, was "going ballistic" and was acting in a completely irrational manner. I am unfamiliar with the term "going ballistic," but the flight attendant was yelling and irrational.

Rasikh Declaration at ¶ 12.

[6]There is a dispute as to which flight attendant called the cockpit, with the passengers (including Shealy) saying it was Duus, and the airline crew insisting it was Callaway.

erts asked no questions; neither looked through the cockpit window to see what was going on in the cabin. Instead, Swanigan immediately diverted the plane to Reno, where local police and TSA officials were waiting at the gate. The Reno-Tahoe Airport police then came onto the aircraft and the passengers were disembarked.

Plaintiffs, Swanigan and the flight attendants gave written statements to the police. Plaintiffs protested their innocence but the crew wanted to have plaintiffs arrested. Captain Swanigan was adamant that plaintiffs be taken to jail: "I said [to Flight Attendant Callaway], I want them off the airplane. I want them arrested. . . . One of [the police officers] said, If you want to press charges, you are going to have to file a report. I said, No problem; I'll do it." Swanigan Deposition at 116-20.[7]

Nevertheless, the police and TSA quickly cleared plaintiffs to continue flying. They then asked Swanigan to let them reboard Flight 694 to its destination but Swanigan declined, giving as the reason that "his flight attendant would not allow it." Rasikh Declaration at ¶ 15. So, with the help of TSA and local police, plaintiffs booked seats on America West. They were allowed to board this flight even though Alaska contacted America West and urged that plaintiffs be denied passage.

After Flight 694 took off, leaving plaintiffs behind, a flight attendant announced to the remaining passengers that plaintiffs had interfered with the flight crew and were responsible for the diversion. Following the incident, Alaska issued this statement: "I know many of us feel that we were let down because these people were not arrested and also puzzled and dismayed by the ability these same passengers had as they

---

[7]The police report confirms this: "SWANIGAN stated that he wanted the involved passengers deplaned and charged with Interfering with a flight crew." Reno/Tahoe Airport Police Report.

proceeded to another airline, bought tickets and flew to their original destination. Just in case you are wondering, we did inform the other airline of these people and the incident. One has to question if the system really works." Alaska Airlines Chief Pilot's Newsletter, Oct. 2, 2003. Alaska also reported all nine plaintiffs to the Joint Terrorism Task Force.

Plaintiffs suffered serious consequences. Because they had to take a later flight, they missed their scheduled meeting with the manufacturer of natural gas equipment that they had hoped to distribute in Egypt. The meeting was rescheduled but, on the afternoon of the meeting, plaintiffs were collared by the FBI (responding, apparently, to Alaska's Joint Terrorism Task Force report). Plaintiffs were marched under guard through the public areas of their hotel and questioned at length; they were interrogated about their Muslim faith, mosque affiliations, employment histories and the incident on Alaska Airlines. See Ginena Declaration at ¶ 34. Mug shots were taken before plaintiffs were released. *See* Mansour Declaration at ¶ 17. As a consequence, they were two hours late for the rescheduled meeting with the Texas manufacturer, and the hoped-for deal was never consummated. *See* Rasikh Declaration at ¶¶ 29-31. Word of the incident made its way back to Egypt, where a U.S. State Department official mentioned it to one of the plaintiffs. *Id.* at ¶ 32.

## Proceedings Below

Plaintiffs sued Alaska Airlines alleging damages due to delay under Article 19 of the Convention for the Unification of Certain Rules Relating to International Carriage by Air, Oct. 12, 1929, 49 Stat. 3000 ("Warsaw Convention"), and a variety of state-law defamation and intentional infliction of emotional distress claims.

The district court eventually granted Alaska's motion to dismiss plaintiffs' state-law claims as preempted by the Warsaw Convention. Plaintiffs sought leave to file a supplemental

complaint under Fed. R. Civ. P. 15(d), alleging seven new defamation claims based on evidence they obtained during discovery. At about the same time, Alaska filed for summary judgment on plaintiffs' Warsaw Convention claim.

The district court denied plaintiffs leave to file a supplemental complaint, holding both that the motion was improperly brought under Rule 15(d) and that the statute of limitations on their new defamation claims had expired. The district court also granted Alaska's motion for summary judgment on the Warsaw Convention claim on the ground that the airline was entitled to immunity under the Convention on Offenses and Certain Other Acts Committed on Board Aircraft, Sept. 14, 1963, 20 U.S.T. 2941, 704 U.N.T.S. 219 ("Tokyo Convention").

## Analysis

## I. Original Complaint

## A. Warsaw and Tokyo Conventions

In the absence of statute, common carriers such as airlines have the duty "to secure the utmost care and diligence in the performance of their duties," which means "in regard to passengers, . . . the highest degree of carefulness and diligence." *Liverpool & G.W. Steam Co.* v. *Phenix Ins. Co.*, 129 U.S. 397, 440 (1889); *see also Andrews* v. *United Airlines, Inc.*, 24 F.3d 39, 40 (9th Cir. 1994) (explaining that under California law, airlines are "responsible for any, even the slightest, negligence and [are] required to do all that human care, vigilance, and foresight reasonably can do under all the circumstances" (quotation omitted)). When it comes to ejecting passengers from flights, that duty has been modified by federal law. In the case of domestic flights, 49 U.S.C. § 44902(b) grants air carriers immunity if they act reasonably in excluding passengers from a flight. *See Newman* v. *Am. Airlines, Inc.*, 176 F.3d

1128 (9th Cir. 1999); *Cordero* v. *Cia Mexicana De Aviacion, S.A.*, 681 F.2d 669 (9th Cir. 1982).

As to international flights, the common law rule is abrogated by treaty. Any claim by a passenger based on an airline's conduct during flight, or during the process of boarding or leaving an airplane (embarkation or disembarkation), is limited to three kinds of damages: for bodily injury, for mishandled luggage and for delay; and the maximum amount awarded may not exceed $75,000. *See, e.g.*, *Day* v. *Trans World Airlines, Inc.*, 528 F.2d 31, 32-33 (2d Cir. 1975) (explaining the Warsaw Convention's basic provisions). Liability is further limited when a passenger's claim results from actions taken by the pilot or crew to preserve order and safety on board. The Tokyo Convention authorizes pilots to deplane passengers, deliver passengers to law enforcement and forcibly restrain passengers during flight; the airline is immune from any liability if the pilot has "reasonable grounds" to support his actions. As far as we're aware, this is the first case in the United States, and the second reported opinion anywhere, to interpret the Tokyo Convention, the first being the *Zikry* case from Israel, which we discuss at length below. *See* pp. 10972-73, 10975 *infra*.

**[1] 1. Standard of Care.** Alaska and its supporting amici, the Air Transport Association of America and the International Air Transport Association, argue that the airline should not be held liable for its treatment of passengers under the Tokyo Convention unless Captain Swanigan acted in an arbitrary and capricious manner. But the treaty and its drafting history say nothing about "arbitrary and capricious." The standard the treaty adopts is reasonableness. Article 8 of the Tokyo Convention empowers the captain to disembark anyone "who[m] he has reasonable grounds to believe has committed" an act which "jeopardize[s] good order and discipline on board." Article 9 empowers a captain to turn passengers over to the police if he has "reasonable grounds to believe"

that they have committed a "serious offence according to the penal law of the State of registration of the aircraft."

**[2]** "It is well settled that the '[i]nterpretation of [a treaty] . . . must, of course, begin with the language of the Treaty itself.' " *Medellin* v. *Texas*, 552 U.S. 491, 518-19 (2008) (quotation and citation omitted) (alterations in original). The treaty here clearly provides immunity to the airline only if the pilot has "reasonable grounds" to support his actions. "[W]here the text is clear, as it is here, we have no power to insert an amendment." *Chan* v. *Korean Air Lines, Ltd.*, 490 U.S. 122, 134 (1989).

"Because a treaty ratified by the United States is an agreement among sovereign powers, we have also considered as aids to its interpretation the negotiation and drafting history of the treaty . . . ." *Medellin*, 552 U.S. at 507 (quotation omitted). Here, the drafting history is entirely consistent with the treaty's plain language. The American delegate to the Tokyo Convention wanted reasonableness to be the standard because it is a familiar term for American judges and juries. When another delegate moved to replace the phrase "reasonable grounds" with "serious grounds," our delegate objected: "At least in the United States legal system, the phrase 'serious grounds' had no significant legal meaning, while, on the other hand, the phrase 'reasonable grounds' had a substantial legal significance." *International Conference on Air Law*, Vol. 1 ("Minutes"), Doc 8565-LC.152-1 (1966) at 155. Our delegate went on to explain that:

> Within the general concept of United States law, the phrase "reasonable grounds" would give the impression that the aircraft commander would be required to have a substantial basis for his belief, that he could not act on the basis of facts which were inadequate to support his belief to the effect that a person had committed or was about to commit the kind of act under consideration.

*Id.*

Delegates from other nations expressed similar sentiments. The Dutch delegate, for example, said "there had always been an attempt to keep in sight two objectives: Firstly, the safety of civil aviation, and, secondly, the guarantees for individual freedom. For that reason the word 'reasonable' had been introduced." *Id.* at 156 (Netherlands Delegate). The negotiators spent considerable time striking a balance between the need of flight commanders to maintain order and the legitimate expectation of passengers that they be treated fairly and with dignity.

President Johnson's message transmitting the Tokyo Convention to the Senate for ratification and the Senate Report recommending ratification strike the same balance by recognizing that air crews must act reasonably in exercising their authority to deplane passengers. In his message to the Senate, President Johnson wrote that the Convention "provides that only those persons whom the aircraft commander has reasonable grounds to believe have committed, on board his aircraft, an act which is a serious offence can be 'delivered' [to the police]." Message from the President of the United States, transmitting *The Convention on Offenses and Certain Other Acts Committed on Board Aircraft, Signed at Tokyo on September 14, 1963*, S. Exec. Rep. 90-L at 8 (Sept. 25, 1968). The Senate Report recommending ratification explains that "if their actions are reasonable and comply with the Convention, each aircraft crew member and passenger, the aircraft owner or operator, and the person for whom the flight is made, all would have legal immunity." S. Rep. No. 91-1083 (1970), *as reprinted in* 1970 U.S.C.C.A.N. 3996, 3997.

When interpreting international agreements, we must also consult "the postratification understanding of signatory nations." *Medellin*, 552 U.S. at 507 (quotation omitted). The only other reported case interpreting the Tokyo Convention, the Israeli decision of *Zikry* v. *Air Canada*, Civil File No.

1716/05 A (Magistrates Court of Haifa 2006), also required aircrews to act reasonably as a condition for Tokyo immunity. In *Zikry*, the court held that the key questions were "whether reasonable grounds [existed to support] the suspicion that the Plaintiff had committed an offense on board the aircraft, as well as the question of the reasonableness of the steps taken against him." *Id.* § 5.

Finally, our interpretation is consistent with our cases applying the analogous statute for domestic air travel, 49 U.S.C. § 44902(b), which provides that "an air carrier, intrastate air carrier, or foreign air carrier may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety." *Cordero*, our first opinion interpreting section 44902(b)'s predecessor, held that airlines must act reasonably. Highly pertinent to our case, *Cordero* held that airlines don't have immunity when they bar passengers from boarding on the basis of "unreasonably or irrationally formed" beliefs. 681 F.2d at 671. That interpretation was reaffirmed seventeen years later by *Newman*, which also held that "the decision to refuse passage cannot be unreasonable or irrational." 176 F.3d at 1131 (citing *Cordero*, 681 F.2d at 671).

Reasonableness is a well-established and easily-understood standard, one that American courts are accustomed to applying in a wide variety of situations involving the behavior of individuals. "Arbitrary and capricious," by contrast, is a standard normally applied to actions of government agencies or judicial officers; it is seldom used to judge the conduct of individuals in the real world. Juries determine whether conduct is reasonable many times every day but almost never whether conduct is "arbitrary and capricious." If "arbitrary and capricious" means something other than "reasonable grounds," we see no basis for adopting a standard that departs from that specified in the treaty. And, if "arbitrary and capricious" is the same as "reasonable grounds," using different language to express the same idea can only cause confusion.

**[3]** We are aware that the First Circuit in *Cerqueira* v. *American Airlines, Inc.*, 520 F.3d 1 (1st Cir. 2008), adopted an "arbitrary or capricious" standard for judging the behavior of airline crews who bar passengers from flying on domestic flights. We decline to follow *Cerqueira.* To begin with, the court's discussion of the issue is entirely dicta because the passengers there were excluded from the flight by the police not the airline: "During his conversations with the sky marshals service, systems operations control, and the chief pilot on duty, a state police officer approached [the pilot] and told [him], point blank, 'These three gentlemen are not traveling with you today. It's out of your hands.' " *Id.* at 8 (quotation omitted). It is thus unclear why the First Circuit thought it necessary to expound at length on this issue. Moreover, as explained above, *Cordero* adopts a reasonableness standard and remits the issue to the jury. *Cerqueira* thus departs from *Cordero*, even as it purports to follow it. We are bound by *Cordero* and the language of the Tokyo Convention, not *Cerqueira*, and therefore conclude that airlines are immune from liability for conduct covered by the Tokyo Convention only to the extent flight commanders act reasonably in exercising the powers granted to them under the treaty.

**[4] 2. Summary Judgment.** We recently explained that "summary judgment is generally an inappropriate way to decide questions of reasonableness because the jury's unique competence in applying the reasonable man standard is thought ordinarily to preclude summary judgment." *Gorman* v. *Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157 (9th Cir. 2009) (quotation omitted). We apply this principle in many areas of law. For example, it is generally inappropriate to grant summary judgment on the reasonableness of police conduct, *see, e.g.*, *Howell* v. *Polk*, 532 F.3d 1025, 1027 (9th Cir. 2008) (per curiam) ("[W]e frequently entrust juries with the task of determining the reasonableness of police conduct."), or when applying state tort law, *see, e.g.*, *Wallis* v. *Spencer*, 202 F.3d 1126, 1144 (9th Cir. 2000) ("[W]hether there was reasonable cause for the removal of Lauren and Jessie from

their home is a question of fact for the jury; so . . . the City is not entitled to summary judgment . . . .").

*Zikry*, the Israeli case, applies this general principle to the Tokyo Convention. The *Zikry* court held that reasonableness had to be determined as a matter of fact, not law. Like Alaska here, Air Canada there sought dismissal of the complaint based on Tokyo Convention immunity, but the court "rejected the application and held that the question whether reasonable grounds to the suspicion [sic] that the Plaintiff had committed an offense on board the aircraft, as well as the question of the reasonableness of the steps taken against him, require[d] factual clarifications and presentation of evidence." *Zikry* § 5 (reciting its earlier order dated September 27, 2005).

*Cordero* and *Newman* are also crystal clear that reasonableness is a jury question. *Cordero* held that "it is peculiarly within the province of the trier of fact to determine whether the defendant's conduct was reasonable." 681 F.2d at 672. Judgment as a matter of law was inappropriate, we held, because there was "ample evidence in the trial record from which the jury might have concluded that [the captain] acted unreasonably in excluding Cordero without even the most cursory inquiry into the complaint against him." *Id. Newman* is no different. There the district court granted summary judgment in favor of the airline but we reversed, relying on *Cordero* to hold that reasonableness must be resolved at trial. *Newman*, 176 F.3d at 1132.

**[5]** As in *Zikry*, *Cordero* and *Newman*, viewing the evidence in the light most favorable to the plaintiffs, a fact finder here could conclude that Captain Swanigan did not have reasonable grounds to believe that plaintiffs posed a threat to the security or order of the aircraft. To begin with, plaintiffs presented evidence that Swanigan didn't have reasonable grounds for diverting the plane to Reno. He made the decision to divert after one of the flight attendants called the cockpit and reported that "she had lost control of the first class cabin."

Mansour Declaration at ¶ 6; *see also* Swanigan Deposition at 96 ("[She said] I've lost control of the first-class cabin."). Swanigan asked no questions and did nothing else to confirm or clarify this statement. Neither he nor his co-pilot looked into the cabin through the cockpit window which, as plaintiffs' expert witness Captain Mark Swint[8] explained, is a "thick acrylic window" that "is significantly larger tha[n] the common 'peep hole' of the average hotel room . . . provides a significantly clearer view . . . is mounted in the door . . . within arm's reach of the pilots when seated" and is "designed to give the pilots an adequate idea of the circumstances on the other side of the door." Swint Declaration at ¶¶ 47, 48.[9] Indeed, immediately after landing, Captain Swanigan told one of the flight attendants that he "ha[d] no idea what went on back there." Swanigan Deposition at 115. A jury could conclude that a reasonable captain should have tried to find out *something* about what was going on in the cabin before undertaking an emergency landing.

Swanigan claims that he and the co-pilot heard shouting in the background when he spoke with the flight attendant, which confirmed that there was chaos in the cabin. Swanigan Deposition at 97. But this claim is contested by plaintiffs and Shealy who report that the passengers had fallen silent by the

---

[8]Captain Mark Swint has been flying for United Airlines for over two decades. He has 35 years of experience in the airline industry, including as an Interview Captain and Line Check Airman for United Airlines. He was the subject of a United training video that focused on his handling of a real in-flight emergency that arose during one of his flights. Swint Declaration at ¶ 13.

[9]Amicus the International Air Line Pilots Association attempts to explain in its brief that it was impractical or impossible for either the pilot or co-pilot to look through the cockpit window. But these facts are not in the record and plaintiffs have not had the opportunity to challenge them. Captain Swint also explains in his declaration that "[i]t is a simple matter to stand up, turn around taking no more than one step and look through the port. The entire process takes less than 5 seconds." Swint Declaration at ¶ 48. There is thus at least a dispute as to how a reasonable captain would have responded in the circumstances.

time the flight attendant called the cockpit. *See* Shealy Declaration at ¶ 9 ("All discussion and loud voices stopped. [Duus] went and got a phone . . . ."); Mansour Declaration at ¶ 6 ("Everyone was sitting and no one but the flight attendant was speaking."); Ginena Declaration at ¶ 16 ("At all times while the flight attendant was yelling no one else was yelling or speaking as loud."). As expert witness Captain Swint said in his declaration, "it is difficult to understand how Captain Swanigan could have allowed this event to escalate to the level that it did without ever asking anything about it. . . . Actions taken in haste and without an understanding of the pertinent facts are unreasonable and in some cases even dangerous." Swint Declaration at ¶¶ 46, 55.[10] A jury could reasonably accept this conclusion after hearing all the evidence.

Even if the jury were to find that Captain Swanigan had reasonable grounds to divert the plane to Reno, it could well conclude that he did not act reasonably once the plane was on the ground. At the time Swanigan landed the plane he had no direct information about what had happened in the cabin. He ordered the plaintiffs deplaned and arrested based on his understanding at that time. Jurors could reasonably find that Captain Swanigan should have listened to plaintiffs' side of the story before forcing them off the plane and turning them over to the police. The plane was on the ground; the cabin

---

[10]Captain Swint also faults Captain Swanigan and the Alaska flight crew for failing to adhere to the principles of Crew Resource Management (CRM). CRM provides guidance on how the crew should communicate with each other and deal with problems; it is mandated by the FAA. *See* FAA Advisory Circular 120-51E (January 22, 2004). CRM's emphasis on clear communications and coordination among crew members is at the heart of the FAA's Advisory Circular: "The importance of clear and unambiguous communication must be stressed in all training activities involving pilots, flight attendants, and aircraft dispatchers. The greater one's concern in flight-related matters, the greater is the need for clear communication." *Id.* at ¶ 12a. Captain Swint points out that the crew of Alaska Airlines Flight 694 failed to follow these principles, so the flight commander had no idea what the problem was in his cabin and decided to divert the plane to Reno with insufficient knowledge of the situation.

was secure; the door to the jetway was open; the police were nearby. The captain could have taken a few minutes to find out for himself why he had been required to divert the plane and make an emergency landing. To assume that the fault lay with the passengers rather than the crew, without making the least inquiry, may not have been reasonable. *See Cordero*, 681 F.2d at 672.

Indeed, a captain's failure to investigate a flight attendant's adverse report about a passenger is precisely what *Cordero* held was unreasonable. 681 F.2d at 672. The jury there found that the pilot acted unreasonably, but the district court granted judgment notwithstanding the verdict to the airline. *Id.* at 671. We reversed, holding: "There is ample evidence in the trial record from which the jury might have concluded that [the captain] acted unreasonably in excluding Cordero without even the most cursory inquiry into the complaint against him." *Id.* at 672. We see no reason to depart from that sensible holding.

Moreover, while *Cordero* involved only disembarkation, Swanigan went further by delivering plaintiffs to the police, which requires even stronger support than merely removing a passenger from the plane. Tokyo Convention Article 8 permits "[t]he aircraft commander" to "disembark . . . any person who he has reasonable grounds to believe has committed, or is about to commit, on board the aircraft . . . act[s]" which "*whether or not they are offences*, may or do jeopardize the safety of the aircraft or of persons or property therein or which jeopardize good order and discipline on board." (Emphasis added.) Tokyo Convention Article 9, by contrast, only permits the flight commander to "deliver to the competent authorities . . . any person who he has reasonable grounds to believe has committed on board the aircraft an act which, in his opinion, *is a serious offence* according to the penal law of the State of registration of the aircraft." (Emphasis added.)[11]

---

[11]*See also Minutes* at 184 ("[I]t was necessary to draw a distinction between . . . disembarkation . . . and . . . delivery . . . . In the latter case

According to Alaska, Captain Swanigan believed plaintiffs' conduct violated 49 U.S.C. § 46504 (interference with flight crew members and attendants). But the statute is violated only if the interference is accomplished "by assaulting or intimidating a flight crew member or flight attendant." Viewing plaintiffs' version of the facts, they did absolutely nothing that anyone could reasonably believe was criminal. None of the passengers made threats or got physical with the flight attendants. Even the story told by the flight crew at the time of the incident does not disclose any action on plaintiffs' part that could amount to a crime.[12]

In his police report, Captain Swanigan described the situation as follows: "Was advised by cabin crew that passengers were congregating near the Flight Deck Door and they would not stop doing it when ordered. She said things were getting out of hand." Swanigan Police Report. Simple disobedience or sluggish compliance with directions is not the same as "assaulting" or "intimidating" a flight attendant. And "things were getting out of hand," does not suggest criminal conduct. A flight commander is required to know a good deal more before turning passengers over to the police.

**[6]** As an officer charged with enforcing the statute as to passengers aboard his aircraft, Captain Swanigan had to familiarize himself with its terms. *See, e.g.*, *United States* v.

---

there was a presumption that the individual was not free to go where he wished. He could not be delivered to authorities unless he was under some form of restraint. This was not necessarily true in the case of disembarkation . . . [where] the individual was not, at that time, under any form of restraint.").

[12] Long after the incident, in a deposition, one of the flight attendants claimed that both of the passengers to receive Customer Inflight Disturbance Report forms tore or wadded them up and threw them at her. Callaway Deposition at 140-44. That report is not only contradicted by Shealy and the plaintiffs, but by the form itself which one of the plaintiffs produced intact.

*Song Ja Cha*, 597 F.3d 995, 1005 (9th Cir. 2010) ("The Guam police department's failure to know the governing law was reckless behavior; the police officers were a far stretch from *Leon*'s 'reasonably well trained officer.' " (quoting *United States* v. *Leon*, 468 U.S. 897, 923 (1984)). A jury could plausibly conclude that Swanigan lacked reasonable grounds to believe plaintiffs had committed a "serious offence," first because he unreasonably failed to confirm his flight attendant's story, and second, because he had no grounds for believing that plaintiffs had violated 49 U.S.C. § 46504, even accepting everything the flight attendants told him. Indeed, the jury could simply accept the expert testimony of Captain Swint that Swanigan "had no reason or evidence to believe that all nine passengers were equally culpable of whatever offence he assumed had been committed. . . . It is my opinion, that it was impossible for Captain Swanigan to have had reasonable grounds to believe, due to his lack of inquiry and willingness to provide leadership in this event, that any offence was being or about to be committed by any passenger." Swint Declaration at ¶¶ 65, 67.

**[7]** A jury could also conclude that, even if Captain Swanigan initially had grounds to believe that plaintiffs were disruptive or may have committed a serious offense, those grounds dissipated once the Reno police and TSA exonerated plaintiffs and cleared them to continue flying. Further, when some of the plaintiffs asked Swanigan to let them re-board the airplane, he refused on the grounds that "his flight attendant would not allow it." Rasikh Declaration at ¶ 15. Based on this evidence, a jury might well conclude that Captain Swanigan's refusal to let the Egyptians continue on to their destination had nothing to do with safety or order but was designed to placate a flight attendant who had taken a dislike to certain passengers, perhaps because of their nationality or ethnicity. *See Cerqueira*, 520 F.3d at 24 (Lipez, J., dissenting from the denial of rehearing en banc) ("The SOC manager made a separate decision as to whether the passenger could be rebooked on a flight . . . . In doing so, he may have relied—perhaps

unwittingly—on information tainted by a flight attendant's racial animus.")

**[8]** Finally, Alaska and its supporting amici urge us to affirm the district court on the ground that the captain (or aircraft commander, as he is referred to in the Tokyo Convention) must have very broad discretion in acting to preserve the safety of the plane and its passengers, and must be able to rely on uncorroborated information he received from members of his crew in making command decisions. We certainly agree that the captain must be able to act decisively in an emergency and, in doing so, rely on communications from his crew. A jury may reasonably conclude that there was no emergency here. None of the passengers had made any threats, brandished a weapon or touched a flight attendant. Nor had any of the flight crew informed the captain that any of the passengers had done anything to endanger the plane. Even assuming the truth of everything that Captain Swanigan and his crew now say happened, a jury could conclude that the captain acted unreasonably in diverting the plane to Reno, forcing plaintiffs to disembark, turning them over to the authorities and then refusing to let them re-board the flight after the police had cleared them. We therefore reverse the district court's grant of summary judgment to Alaska Airlines under the Tokyo Convention and remand for these issues to be resolved at trial.

## B. Defamation

**[9] 1.** After the plane landed, Captain Swanigan and members of the crew gave formal statements about the incident to the Reno Police and TSA officials. Plaintiffs claim that these reports were knowingly or recklessly false and filed defamation claims based on them. The district court dismissed those claims pursuant to Warsaw Convention Article 17, which preempts local law remedies for claims if based on conduct that occurs "on board the aircraft or in the course of any of the operations of embarking or disembarking." *El Al Israel Air-*

*lines, Ltd.* v. *Tsui Yuan Tseng*, 525 U.S. 155, 172 (1999) (quotation and citation omitted). Plaintiffs claim that the Warsaw Convention does not apply because they had left the plane and thus any actions by the airline fell outside the Convention's protective umbrella.

In determining whether the accident causing a passenger's injuries "took place . . . in the course of any of the operations of . . . disembarking," we conduct an "assessment of the total circumstances surrounding a passenger's injuries . . . ." *Maugnie* v. *Compagnie Nationale Air France*, 549 F.2d 1256, 1257, 1262 (9th Cir. 1977). "[T]he Convention drafters did not draw a clear line" for when disembarkation ends, so we have always rejected an "inflexible rule." *Id.* at 1262. We have also explained that "[w]hether a passenger is embarking or disembarking is a question of federal law to be decided on the facts of each case." *Schmidkunz* v. *Scandinavian Airlines Sys.*, 628 F.2d 1205, 1207 (9th Cir. 1980).

**[10]** In this case, the statements were made in the gate area immediately adjacent to the boarding ramp, shortly after the plane landed. They were made for the sole purpose of transferring custody of plaintiffs from Alaska Airlines to the Reno Police, as authorized by the Tokyo Convention. The Tokyo Convention, moreover, requires flight commanders to provide an explanation to local authorities when they turn over passengers to them. Tokyo Convention Arts. 8(2) & 9(3). It is thus fair to say that the pilot's statements to the police were part of the disembarkation process. Considering "the total circumstances surrounding [plaintiffs'] injuries, viewed against the background of the intended meaning of Article 17," *Maugnie*, 549 F.2d at 1262, we conclude that the crew's report to the police was covered by the Warsaw Convention. Our conclusion is in accord with *Zikry*, the only other reported opinion that analyzes the relationship between the Tokyo and Warsaw Conventions. As the *Zikry* judge explained, "it is obvious that all the events are connected to the flight. The [Warsaw] Convention applies also to embarka-

tion and disembarkation and all the activities following that were links in one chain." *Zikry* § 19. We therefore affirm the district court's dismissal of plaintiffs' defamation claims based on the statements made in the terminal.

**2.** Plaintiffs further allege that after Flight 694 took off from Reno to complete the trip to Las Vegas, a member of the crew made an in-flight announcement blaming plaintiffs for causing the diversion. Plaintiffs filed an additional defamation claim for this statement. Like the other defamation claims, the district court dismissed this claim on the pleadings as preempted by the Warsaw Convention.

In supplemental briefing, both the United States and Egypt urge us to reverse this dismissal. Their views deserve serious consideration. *See, e.g.*, *El Al Israel Airlines, Ltd.*, 525 U.S. at 168 (interpreting the Warsaw Convention and explaining that "[r]espect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty"); *Zicherman* v. *Korean Air Lines Co.*, 516 U.S. 217, 226 (1996) ("Because a treaty ratified by the United States is . . . an agreement among sovereign powers, we have traditionally considered as aids to its interpretation . . . the postratification understanding of the contracting parties.").

Quoting from Articles 1(1) and 17, the United States in its amicus brief argues that "[t]he Warsaw Convention by its terms applies only to injuries suffered during the 'international carriage of persons.' Such carriage ends when 'the operations of . . . disembarking' have completed." Egypt agrees, quoting from Article 17 and explaining that the key question is "whether *the passengers* were still involved 'in the course of any of the operations of . . . disembarking.' "

**[11]** Both the United States and Egypt argue that the Warsaw Convention's preemptive effect exists only so long as the plaintiff is still on the airplane, embarking onto the plane or disembarking from the plane. Nothing in the Convention sug-

gests that it extends to lawsuits filed by former passengers for things that happen on planes long after they've disembarked. We therefore reverse the district court's dismissal of plaintiffs' defamation claim for the post-disembarkation, in-flight announcement.

## II.    Supplemental Complaint

Plaintiffs sought to add seven new defamation claims based on statements Alaska's employees made to America West Airlines, to the Joint Terrorism Task Force and in internal newsletters. Alaska stated in internal newsletters that plaintiffs had been "argumentative and abusive," should have been "arrested" and shouldn't have been permitted to "proceed[ ] to another airline, [buy] tickets and fl[y] to their original destination." Alaska Airlines Chief Pilot's Newsletter, Oct. 2, 2003. The newsletters also recounted how Alaska "inform[ed] the other airline of these people and the incident." *Id.* Additionally, Alaska filed a formal report with the Joint Terrorism Task Force in which it reported the entire Egyptian party for causing a "disturbance" in which the captain heard "lots of loud talking, bordering on yelling." Alaska JTTF Report. Plaintiffs attempted to add defamation claims for these statements by filing a supplemental complaint pursuant to Fed. R. Civ. P. 15(d), rather than by amending their complaint using Fed. R. Civ. P. 15(a). Plaintiffs acknowledge that the acts of defamation underlying these claims occurred between September 29, 2003 and October 3, 2003, and that their original complaint was filed on September 17, 2004. Plaintiffs claim, however, that they did not have the information until it was supplied by defendants in discovery, which itself was late.

[12] Rule 15(d) provides a mechanism for parties to file additional causes of action based on facts that didn't exist when the original complaint was filed. *See, e.g.*, *Cabrera* v. *City of Huntington Park*, 159 F.3d 374, 382 (9th Cir. 1998) (per curiam). Plaintiffs, however, seek to add defamation claims arising from conduct which happened nearly a year

*before* they filed their first complaint. These claims could not, therefore, be brought as supplemental pleadings under Rule 15(d). *See, e.g., id.*; *U.S. for Use of Atkins* v. *Reiten*, 313 F.2d 673, 674 (9th Cir. 1963) ("Since the additional allegations in appellant's 'amended complaint' related to events which had 'happened since the date of the pleading sought to be supplemented,' Rule 15(d), Federal Rules of Civil Procedure, was applicable."); William W Schwarzer et al., *California Practice Guide: Federal Civil Procedure Before Trial* § 8:1377 (The Rutter Group 2009) ("A pleading may be 'supplemented' where the pleader desires to set forth allegations concerning matters which have taken place *since* the original pleading was filed.").

**[13]** The only available mechanism for adding these claims was an amended complaint pursuant to Rule 15(a). But, despite ample warning from the district court, which explained at length that plaintiffs' claims were not properly brought as supplemental pleadings, plaintiffs insist that these defamation claims were properly filed under Rule 15(d). Their brief presents the issue as simply: "Did the district court improperly deny leave to file a supplemental complaint alleging defamation claims accruing after the original complaint was filed . . . ?" The answer is clearly "no" for the reasons explained above. Because plaintiffs don't make a Rule 15(a) argument, we say nothing on that score. *See, e.g., Seven Words LLC* v. *Network Solutions*, 260 F.3d 1089, 1097 (9th Cir. 2001) ("[It is a] longstanding rule that we do not consider arguments not raised in the briefs.").

**[14]** Because we affirm the district court's denial of the motion as improperly brought under Rule 15(d), we needn't reach the question of whether Nevada's discovery rule tolled the statute of limitations. We leave the question of whether plaintiffs may now file a Rule 15(a) motion for leave to

amend their complaint for the district judge to decide in the first instance.[13]

\* \* \*

We are mindful of the claims of Alaska Airlines and its supporting amici that flight commanders must be given wide latitude in making decisions to preserve safety and orderly conduct aboard an aircraft in flight. But passengers also have a legitimate interest in being treated fairly and with dignity; they are, after all, captives of the airline for the duration of the flight, and may be stranded far from home if not allowed to continue on the flight they have paid for. Moreover, air crews have both de facto and de jure law enforcement authority when the plane is in the air.

These concerns are particularly acute in international flights where passengers may be stranded not only far from home, but confronting police in a foreign country. The Tokyo Convention negotiators worried about this possibility and deliberately chose not to give flight crews unfettered discretion to deplane passengers and turn them over to authorities; rather, they insisted that flight crews act reasonably in doing so. Treating foreign passengers fairly when they are mistreated by our airlines will make it more likely that Americans traveling abroad will be treated fairly by foreign airlines and the foreign authorities where they land.

The record contains substantial evidence that would support a jury's finding that Captain Swanigan and his crew acted

---

[13]We do note that under Nevada law, the question of whether plaintiffs were diligent and the delay was caused by Alaska—thereby tolling the statute of limitations—is a factual one that is sufficiently contested in this case that it must be decided by a jury. *See, e.g.*, *Nev. Power Co.* v. *Monsanto Co.*, 955 F.2d 1304, 1307 (9th Cir. 1992) ("[Diligence] may be decided as a matter of law only when uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have discovered the fraudulent conduct.").

unreasonably toward the plaintiffs. We reverse the grant of summary judgment on plaintiffs' delay claims and remand them for trial along with their defamation claim for the in-flight announcement after the plane took off from Reno. We affirm the dismissal of plaintiffs' defamation claims for the statements made on the ground and the district court's denial of plaintiffs' motion to supplement their complaint.

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED.**

OTERO, District Judge, dissenting in part and concurring in part:

The facts of this case revolve around an unfortunate in-flight incident that occurred September 29, 2003, on board an international flight from Vancouver, British Columbia, to Las Vegas, Nevada resulting in the diversion of the aircraft and removal of Plaintiffs.[1]

Depending on whose perspective of the events one adopts, Captain Swanigan, Alaska's vice president of flight operations, is either a dedicated, experienced pilot who believed that an in-flight emergency required him to immediately land his aircraft, or a simpleton in charge of a cockpit crew that failed to follow airline procedures and who was buffaloed by two vindictive flight attendants into needlessly diverting the flight and forcing passengers off the plane.[2] I take the former view.

---

[1]The incident occurred just two years after the September 11, 2001 hijackings and attacks on New York and Washington, D.C.

[2]Captain Swanigan has been an Alaska pilot since 1980. In 1993, he was promoted to Chief Pilot, a position in which he managed the entire pilot group at Alaska. In 1995, he was promoted to Vice President of Flight Operations, in charge of a $400 million budget and all pilots, training, flight simulation, and flight control.

More importantly, the unintended but probable consequence of the standard my colleagues adopt for judging the in-flight conduct of a pilot under the Tokyo Convention is risk to passenger and crew safety — an affront to the principal purpose of the Tokyo Convention.[3] The majority misinterprets the standard and examines facts in hindsight that were unknown to the captain at the time of the event, concluding that Captain Swanigan may have acted unreasonably. I respectfully dissent from the adoption of a reasonableness standard in favor of a more deferential arbitrary or capricious standard.

## I.  *Facts*

It is imperative to recite the facts from the perspective of Captain Swanigan.[4] While the majority correctly states that evidence must be viewed in the light most favorable to the plaintiffs in a motion for summary judgment, using the correct standard for judging the pilot's decision requires us to restrict the analysis to the information that the pilot knew at the moment a decision was required. Walk with me for a minute and consider the incident from the perspective of Captain Swanigan.[5]

---

[3]Convention on Offenses and Certain Other Acts Committed on Board Aircraft, Sept. 14, 1963, 20 U.S.T. 2941, 704 U.N.T.S. 219 (1969) [hereinafter Tokyo Convention].

[4]There is no material dispute of facts as to the information that was before Captain Swanigan.

[5]Indeed, the majority's recounting of the facts includes many pieces of information that are irrelevant for the purposes of judging the captain's decision. Not only does the majority include such tidbits as whether the passengers' conversations with one another were pleasant or not — something the captain could not possibly have known or factored into his decision — but my colleagues also rely heavily on the testimony of Kimberlie Shealy, whom they believe provides "the only independent account." Majority Op. at 10963. But Ms. Shealy has a dog in this fight; she was a fellow first class passenger inconvenienced because her flight was diverted. Life experience suggests that a passenger whose plans were sig-

## A.  *The Diversion of the Aircraft*

About one hour into the flight, approximately 65 miles south of Reno, Nevada, Captain Swanigan received a call on the aircraft interphone from flight attendant Ms. Calloway. Ms. Calloway told him, "I've got some passengers giving me a bit of a problem here in first class. I'd like to have security meet the airplane when we get in." Captain Swanigan responded, "Is there anything urgent, anything we need to know?" Ms. Calloway said, "No, I think I've got it under control." Following the conversation, Captain Swanigan put the aircraft into "lockdown mode" and turned on the "fasten seat belt" sign.

Minutes later, Captain Swanigan received a second call from Ms. Calloway. According to Captain Swanigan:

> She came across distraught; almost sounded like she was crying, to me, and said, Mike, I've lost control of the first-class cabin. And when I heard that, also I heard a bunch of yelling and screaming coming through the interphone. . . . I've been [with] the airline 26 years; I've never heard anything like that in my entire career.

Captain Swanigan confirmed with First Officer Roberts that he was indeed hearing the yelling and screaming in the back-

---

nificantly altered due to an unscheduled landing might not view the airline in a completely objective light. *See Cordero v. Cia Mexicana De Aviacion, S.A.*, 681 F.2d 669 (1982). In any event, at the time he acted, Captain Swanigan had no information regarding Ms. Shealy's account and could not exit the cockpit to inquire further. *See* FAA Crew Training Manual, Common Strategy for Hijack, app. II at 21. In the event of a disturbance, pilots are to remain in the closed cockpit, and cannot leave the cabin to assist crew members.

ground. Upon confirmation, Captain Swanigan told Ms. Calloway "we're landing the airplane now."[6]

At the time of this decision, the aircraft was approximately 100 miles past Reno and 200 miles from Las Vegas, with a difference in flight time of approximately 25 minutes. As Alaska Flight 694 was traveling at approximately 500 miles per hour, this means that Captain Swanigan only had a few moments to make a decision as to whether to divert the plane to Reno or commit to continuing all the way to Las Vegas. Captain Swanigan contacted air traffic control to report the passenger disturbance and to request permission to make a forced emergency landing at the nearest suitable airport. He received permission and landed the aircraft in Reno.

**B.  *The Removal of Plaintiffs from the Aircraft***

Upon landing, the aircraft was met at the gate by officers from the Reno-Tahoe Airport Police Department. Captain Swanigan requested that Ms. Calloway assist the officers in securing the first class cabin, and then meet him at the top of the jetway to discuss what had happened on board.

During his meeting with Ms. Calloway, Captain Swanigan learned the following:

- There were six passengers involved.

- They began causing problems during departure operations by distracting Ms. Calloway during

---

[6]Plaintiffs and Shealy claim it was Ms. Duus and not Ms. Calloway who called Captain Swanigan. However, they do not dispute that he was told by a flight attendant that there had been a loss of control in the first class cabin. Plaintiffs additionally claim that Captain Swanigan lied about hearing screaming during the phone call. However, according to Plaintiff Reda Ginena, the flight attendant "literally screamed into the phone that she had lost control of the first class cabin . . . ." Thus, there is no dispute that Captain Swanigan heard screaming.

safety briefings and continuing to use their cell phones after being asked to turn them off.

- While in flight, they congregated near the cockpit door, forward galley, and the forward lavatory. When told that these actions were prohibited, they responded: "[Y]ou Americans [are] so paranoid and all of these safety and security regulations [are] stupid."

- They refused to leave the restricted area in the front of the airplane.

- After several verbal warnings, Ms. Calloway gave them a written warning and they "exploded" at that point.

- The fact that there were six people in a "hostile mood" became "very intimidating" to the flight attendant crew.

Based on these representations, Captain Swanigan believed that the offending passengers had interfered with his flight crew in violation of federal law.

Captain Swanigan asked the officers to remove the offending passengers from the aircraft and press charges. Captain Swanigan had Ms. Calloway return to the first class cabin to identify the offending passengers. After Plaintiffs were identified, the record indicates that three of the Plaintiffs were asked to exit and then escorted off the aircraft (the other Plaintiffs had already voluntarily deplaned).[7]

---

[7]Although Plaintiffs contest this point and argue that all Plaintiffs were delivered, Judge Jones clarified any ambiguity in the record at oral argument by specifically asking Plaintiffs' counsel who extracted them and whether they left willfully. In response, Plaintiffs' counsel unequivocally admitted that the Reno-Tahoe airport police asked three Plaintiffs to leave and that those three "were removed from the aircraft but all the [sic] nine people who were traveling with them left simultaneously . . . . They willfully chose to leave." Appellee's Supplemental Excerpts of R. 8:17-25, 9:2-7.

Upon reaching the terminal end of the jetway, Plaintiffs were led to an adjacent gate area where additional law enforcement officials were stationed. Captain Swanigan, Ms. Calloway, and one of the remaining two flight attendants, joined Plaintiffs. The parties produced written statements recounting their respective versions of the incident. The officers ultimately determined that no crime had occurred and informed Captain Swanigan that Plaintiffs would not be arrested. The Plaintiffs who were escorted off the aircraft were refused carriage, and with the assistance of the officers, were boarded on a flight to Las Vegas on a different airline.

Captain Swanigan and his flight crew returned to the aircraft and resumed the flight to Las Vegas. According to Plaintiffs, once back in the air, "one of [Alaska's] flight attendants made an announcement to all passengers that the flight had been diverted and delayed due to a disturbance created by the plaintiffs."

## II.   *Standard of Care*

### A.   *Under the Tokyo Convention, the Aircraft Commander's Actions Are Judged Under a Deferential Reasonableness Standard: Her Actions Are Protected Unless They Are Arbitrary or Capricious.*

The majority correctly states that the "interpretation of a treaty, like the interpretation of a statute, begins with its text. . . ." *Medellin v. Texas*, 128 S. Ct. 1346, 1357 (2008) (internal quotation marks and citations omitted). But because "a treaty ratified by the United States is an agreement among sovereign powers, we have also considered as aids to its interpretation the negotiation and drafting history of the treaty as well as the postratification understanding of signatory nations." *Id.* at 1357 (internal quotation marks and citations omitted); *see also Air France v. Saks*, 470 U.S. 392, 396 (1985) ("'[T]reaties are construed more liberally than private agreements, and to ascertain their meaning [courts] may look

beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties.' ") (quoting *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 431-32 (1943)). Accordingly, courts look to extrinsic sources to aid in the interpretation of a treaty even with a relatively low level of ambiguity.

The existence of analogous United States law also may be relevant to the analysis. *Cf. In re Extradition of Smyth*, 72 F.3d 1433, 1441 (9th Cir. 1996) (Reinhardt, J., joined by Pregerson, Noonan & O'Scannlain, JJ., dissenting) ("The panel's interpretation of the Treaty is also inconsistent with the interpretation given the analogous United States law governing asylum and withholding of deportation . . . ."); *Delchi Carrier SpA v. Rotorex Corp.*, 71 F.3d 1024, 1028 (2d Cir. 1995) ("Caselaw interpreting analogous provisions of Article 2 of the Uniform Commercial Code ("UCC") may also inform a court where the language of the relevant [United Nations Convention on Contracts for the International Sale of Goods] provisions tracks that of the UCC.").

Application of these principles leads me to conclude that the Tokyo Convention affords considerable deference to the in-flight actions of the aircraft commander. In short, such actions are permitted unless arbitrary or capricious.

    **1.** *Although the Text of the Tokyo Convention Is Unclear as to the Degree of Deference Owed the Aircraft Commander, the Context in Which the Words Are Used Supports a Deferential Standard*.

Interpretation of the Tokyo Convention standard turns on the meaning of the terms "reasonable grounds to believe" and "reasonable measures . . . which are necessary." The majority correctly states that the text of the treaty uses the words "reasonable grounds" and not "arbitrary and capricious." Majority Op. at 10970. However, it is not clear that in using the phrase "reasonable grounds," the drafters intended the aircraft com-

mander's actions to be judged by a reasonableness standard as that standard has been interpreted and applied by American courts. These terms are not defined in the treaty, and the majority incorrectly asserts that the terms are clear on their face. Majority Op. at 10971. While I acknowledge that the term "reasonable" is familiar in American law, I emphasize that the relevant text in the instant case comes from a multilateral agreement among nations with significant differences in both procedural and substantive law.[8] Examining the context in which the words are used to gain a sense of what the drafters intended to accomplish is a prudent step for courts to take. It would be an oversight on our part to assume that the phrase "reasonable grounds" in the Tokyo Convention should be construed to mean the American reasonableness standard.

Alaska and the United States argue that these terms impose a standard of deferential reasonableness, while the majority agrees with Plaintiffs in holding that they impose a standard that sounds in negligence.[9] Given the facial ambiguity of these terms, *see Yusupov v. Attorney General*, 518 F.3d 185, 200 (3d Cir. 2008) (describing the phrase "reasonable grounds to believe" as "ambiguous"); *Williams Natural Gas Co. v.*

---

[8]Under the auspices of the International Civil Aviation Organization ("ICAO"), a specialized agency of the United Nations, the representatives of 61 governments participated in the drafting and enactment of the Tokyo Convention. *See* Robert P. Boyle & Roy Pulsifer, *The Tokyo Convention on Offenses and Certain Other Acts Committed on Board Aircraft*, 30 J. Air L. & Comm. 305, 305 (1964). The Tokyo Convention was signed on September 14, 1963, by 16 of the states represented, including the United States and Canada, and was entered into force on December 4, 1969. Dep't of State, *Treaties in Force: A List of Treaties and Other International Agreements of the United States in Force on January 1, 2007*, 24 (2007). There are currently 185 parties to the Tokyo Convention, including the United States and Canada. *Id.*

[9]In our order dated April 23, 2008, we invited the United States to set forth its views as to the proper application of the Tokyo Convention. The Airline Pilots Association, International and the Air Transport Association of America, Inc. had previously filed *amicus curiae* briefs in support of a deferential standard.

*F.E.R.C.*, 943 F.2d 1320, 1331 (D.C. Cir. 1991) (stating that the words "reasonable" and "necessary" "are among the broadest in the congressional lexicon of delegation"), the dispute cannot be resolved solely by reference to the text of the standard. However, the context in which these terms are used does support the deferential standard urged by Alaska and the United States.[10] Specifically, the "[p]owers of the aircraft commander" are broadly defined under the Tokyo Convention in a manner that suggests considerable deference should be owed the aircraft commander in her exercise of those powers.

First, deference is given to the aircraft commander as to whether to take action at all. Articles 6, 8, and 9 of the Tokyo Convention state that the aircraft commander "may" take action, not that he must take action. Only when action is taken do certain affirmative obligations attach.

Second, action is permitted under a broad set of circumstances. *See* Tokyo Convention, *supra* note 1, art. 1. The aircraft commander need not wait for a passenger to commit a dangerous or disorderly act; it is enough if the aircraft commander believes that the passenger "is about to commit" such an act. *Id.* at art. 6. Nor need the aircraft commander determine whether a passenger's act will in fact imperil the aircraft, or even affect safety per se; it is enough that the act "may" jeopardize the safety of the aircraft or will jeopardize "good order and discipline on board." *Id.* at art. 1.

Third, the aircraft commander is authorized to decide what action to take with regard to a disruptive passenger. Provided such action is necessary to protect the safety of the aircraft or persons or property therein, to maintain good order and disci-

---

[10]*See* Brief for the United States of America as Amicus Curiae at 9, Eid v. Alaska Airlines, Inc., No. 06-16457 (9th Cir. July 22, 2008) ("Given the breadth of discretion afforded the aircraft captain and the purpose of the Convention's grant of immunity, review of actions taken by a captain pursuant to the Tokyo Convention must be highly deferential.").

pline on board, or to facilitate delivery or disembarkation of a passenger, the aircraft commander is entitled to take *any* "reasonable measure[ ]" under the circumstances.

Lastly, where the aircraft commander acts in accordance with the Tokyo Convention, neither he, nor any other member of his crew, nor the airline, may be held responsible in "any proceeding." Such broad immunity allows the aircraft commander to act without hesitation to guard passenger safety, and without concern of being second-guessed if she does — a strong indication that a commander's judgments are entitled to deference absent a showing of arbitrary or capricious behavior.

In light of the deference given the aircraft commander as to whether, when, and how to act, as well as the accompanying grant of blanket immunity, consistency suggests that the terms "reasonable grounds to believe" and "reasonable measures . . . which are necessary" should be interpreted broadly in favor of a deferential standard.

### 2. *The Negotiation and Drafting History of the Tokyo Convention Supports an Arbitrary or Capricious Standard*.

An evaluation of the negotiation and drafting history of the Tokyo Convention — another vital step to take in order to apply the treaty properly — supports a finding that the drafters intended for the aircraft commander's actions to be judged by a deferential reasonableness standard.

With respect to the requirement that the aircraft commander's belief be based on "reasonable grounds," the drafters opposed any efforts to impose a more severe test. Their comments suggest that by "reasonable," the Tokyo Convention drafters meant to protect the actions of the aircraft commander so long as they are neither arbitrary nor capricious.[11]

---

[11]This is especially true when considering that the Tokyo Convention was developed at a time when there was a discernable increase in passen-

For instance, the parties rejected a proposal by the Swiss delegate to substitute the term "serious grounds" for the term "reasonable grounds." The United States delegate explained why the "less severe" reasonable standard was preferred:

> At least in the United States legal system, the phrase "serious grounds" had no significant legal meaning, while, on the other hand, the phrase "reasonable grounds" had a substantial legal significance. Within the general concept of United States law, the phrase "reasonable grounds" would give the impression that the aircraft commander would be required to have a substantial basis for his belief, that he could not act on the basis of facts which were inadequate to support his belief to the effect that a person had committed or was about to commit the kind of act under consideration. *In other words, the aircraft commander could not act arbitrarily or capriciously.*

International Civil Aviation Organization, *Minutes, International Conference on Air Law, Tokyo, Aug.-Sept. 1963*, Doc 8565-LC.152-1, at 155 [hereinafter *Minutes*] (emphasis added).

The majority cites the same statement to support its position that the standard should be reasonableness. Majority Op. at 10971. But the panel's use of the American delegate's statement is misplaced for three reasons.

First, my colleagues curiously omit the last sentence. This is significant — the sentence cuts against the majority's notion that the arbitrary or capricious standard should be cab-

ger incidents that threatened the safety of international air travel, including violent hijacking. *See* Gerald F. Fitzgerald, *The Development of International Rules Concerning Offences and Certain Other Acts on Board Aircraft*, 1 Can. Y.B. Int'l L. 230, 240-41 (1963).

ined to the actions of government agencies or judicial officers and also directly rebuts the majority's claim that the drafting history "say[s] nothing about 'arbitrary and capricious.' " Majority Op. at 10970. Clearly, the standard was considered to be one that applied to individual aircraft commanders. Second, not even the American delegate described "reasonable grounds" as referring to some sort of objective, "reasonable person" point of view that is so familiar to American torts scholars. Instead, the delegate simply stated that an aircraft commander "could not act on the basis of facts which were inadequate to support *his* belief." Minutes, *supra* (emphasis added). Ultimately, the standard was intended to leave room for a commander to freely make the best judgment possible, without having to conform to an amorphous "reasonableness" standard. Finally, the majority uses an American delegate's statement as affirmation that other nations had all agreed to abide by the American reasonableness standard. But the fact that "reasonableness" is a familiar term in American jurisprudence should not preclude us from examining the intent of the other parties if we are to faithfully execute the true meaning of the treaty. If anything, the American delegate's statement illustrates the very reason why closely examining the treaty's drafting history is critical — certain terms have different meanings for the different nations represented.

Examining the drafting history from a holistic point of view, then, demonstrates that the progression of the drafting went from a restrictive standard to a deferential one. The parties rejected a proposal by the Argentinian delegate to add words "which would indicate that the reasonable belief of the aircraft commander must be founded on some concrete external facts." *Id.* at 179. The Dutch delegate stated that such a requirement would impose too "strict and rigid" a standard. *Id.* at 178.

Similarly, as to the requirement that the "measures" taken by the aircraft commander be "reasonable" and "necessary," the parties appear to have rejected a simple negligence stan-

dard in favor of an arbitrary or capricious standard. The parties rejected a proposal to delete the word "necessary" because, as explained by the Greek delegate, "the word 'necessary' gave a guarantee that the aircraft commander *would not exercise his powers in an arbitrary way*." *Id.* at 174 (emphasis added). The parties also opposed a French proposal to withhold immunity "if it were proved that [the aircraft commander] had been at fault." *Id.* at 219. According to the delegate from the Federal Republic of Germany, the word "reasonable" sufficiently established that the aircraft commander did not enjoy unlimited immunity. Immunity would be withheld only "[i]f the aircraft commander did something without reasonable grounds, *if he intentionally abused his powers or if he was guilty of serious negligence . . . .*" *Id.* at 227 (emphasis added). In light of similar opposition, the French delegate withdrew his proposal.

To be sure, the drafting history is not, as the majority writes, "entirely consistent" with a reasonableness standard. A thorough and careful examination of the drafting history indicates that the standard should be deferential to the commander.

### 3. *The Majority's Examination of* Zikry *Is Incomplete*.

As the majority indicates, the Israeli case *Zikry v. Air Canada* appears to be the only published decision interpreting the Tokyo Convention's reasonableness standard. *See* Majority Op. at 10972-73. The majority also correctly points out that the court in *Zikry* held that the key questions were whether the captain had "reasonable grounds to believe that an act had been committed which jeopardize[d] the safety of the flight and its passengers" and whether "the steps taken were reasonable." *See* Majority Op. at 10973; *Zikry v. Air Canada*, Civil File No. 1716/05 A (Magistrate Court of Haifa 2006). But the majority again misses the point: the word "reasonable" does not necessarily carry the same meaning across all legal sys-

tems. Accordingly, we must do more than a cursory search for the word "reasonable" in foreign opinions to properly interpret the Tokyo Convention.

In fact, *Zikry* itself contains language that indicates something other than the negligence-esque standard that my colleagues adopt. According to the court in *Zikry*, the proper standard conferred "extensive and wide authority" upon the captain. *Id.* The court also emphasized that "facts are not to be examined by hindsight [as the majority has done here], but at the time of the actual event." *Id.* Such an interpretation is consistent with the arbitrary or capricious standard that the Tokyo Convention establishes, and actually sounds much like the language that this court used in the *Cordero* and *Newman* cases to adopt a deferential reasonableness standard. *See Newman v. American Airlines, Inc.*, 173 F.3d 1128, 1131 (1999); *Cordero*, 681 F.2d at 672.

Finally, it is worth recapping the material facts from *Zikry*, for they help illustrate the degree of deference the pilot should receive in her decisions. The plaintiff in *Zikry* was suspected of smoking a cigarette in a lavatory on a flight from Israel to Canada, detained by police upon arriving in Canada, and refused carriage by the airline on a subsequent leg of the flight. Finding that immunity was warranted, the court dismissed the action. *See Zikry*, Civil File No. 1716/05 A. A passenger who is smoking on a flight, while posing an annoyance to other passengers, can hardly be deemed an emergency situation. Yet the court in *Zikry* applied a deferential standard, isolating the facts to what the pilot knew at the time of the event and granting "extensive and wide authority" upon the pilot in his decision to refuse carriage to the passenger. In the instant matter, Captain Swanigan faced a much more dire situation than a passenger smoking a cigarette — he received word from a flight attendant that she had lost control of the cabin. Relying on his judgment and experience and knowing that he had limited opportunity to act, he landed the aircraft in response to what he legitimately perceived to be a grave

threat. Presumably, if the Tokyo Convention grants deference to a pilot who bases his decision on a passenger smoking a cigarette, it also grants deference to a pilot who bases his decision on belief that the crew lost control of the cabin.

### 4. *49 U.S.C. § 44902(b) Supports an Arbitrary or Capricious Standard*.

The majority correctly recognizes 49 U.S.C. § 44902(b) as the analogous statute for domestic air travel. But my colleagues interpret it to impose a reasonableness standard, when courts' prior interpretations of the statute indicate otherwise. Under 49 U.S.C. § 44902(b), "an air carrier, intrastate air carrier, or foreign air carrier may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety." Like the Tokyo Convention, this statute authorizes airlines to deny passage to air travelers under certain circumstances. Although § 44902(b) does not contain the phrase "reasonable grounds" like the Tokyo Convention, courts have read into the statute a deferential reasonableness standard akin to that under the Tokyo Convention: the exercise of power under § 44902(b) is proper where the aircraft commander's belief that a passenger is or might be inimical to safety is reasonable, and where the action taken based upon that belief is reasonable. These same courts have interpreted "reasonableness" to refer to actions that are neither arbitrary nor capricious; that is, deference is inherent in this context. Based on the similarity of the § 44902(b) and Tokyo Convention standards, as well as the similarity of circumstances to which these standards apply, the case law interpreting § 44902(b)'s reasonableness requirement is particularly relevant to the instant analysis.

The first articulation of § 44902(b)'s deferential reasonableness standard was set out by the Second Circuit in *Williams v. Trans World Airlines*, 509 F.2d 942 (2d Cir. 1975):

> The test of whether or not the airline properly exercised its power . . . to refuse passage to an applicant

> or ticket-holder rests upon the facts and circumstances of the case as known to the airline at the time it formed its opinion and made its decision and whether or not the opinion and decision were rational and reasonable and not capricious or arbitrary in the light of those facts and circumstances. They are not to be tested by other facts later disclosed by hindsight.

*Id.* at 948. The court emphasized that a deferential standard requiring "less than absolute certainty" was necessary because decisions would need to be made in a compressed time frame and in light of the potential risks of inaction. *See id.* at 946, 948. Accordingly, the air carrier need not make a "thorough inquiry" before proceeding under the statute. *Id.* at 948. A compressed time frame, of course, is precisely what Captain Swanigan was facing.

This court adopted the *Williams* test in *Cordero* when it held that "the district court properly instructed the jury in the precise language of the *Williams* test." The majority recognizes that *Cordero* "held that airlines don't have immunity when they bar passengers from boarding on the basis of 'unreasonably or irrationally formed' beliefs." Majority Op. at 10973 (citing *Cordero*, 681 F.2d at 671). It is not clear, however, why the majority believes that this establishes a reasonableness standard. There is a subtle but important difference between examining an aircraft commander's decisions under a reasonableness standard and permitting a commander's actions unless *un*reasonable. The language in *Cordero* establishes the latter, which aligns with the arbitrary or capricious standard as I have articulated above. The majority's citation of *Newman* is also puzzling for the same reason. My colleagues believe that this court further supported a reasonableness standard in *Newman* when we held that "the decision to refuse passage *cannot be unreasonable or irrational*." *Id.* (emphasis added). Again, this language supports an arbitrary or capricious standard, not a reasonableness standard.

The *Willliams* test was adopted most recently by the First Circuit in *Cerqueira v. American Airlines, Inc.*, 520 F.3d 1 (2008). The court clarified that "[t]he arbitrariness or capriciousness standard here is not the same as reasonableness under a negligence standard." *Id.* at 14 n.17. Rather, an arbitrary or capricious standard appears to create a presumption of reasonableness. *Id.* at 14. According to the court:

> Some courts have described an air carrier's reliance on § 44902(b) as a defense in the nature of an immunity. . . . In our view, § 44902(b) does not merely create a defense: the statute is an affirmative grant of permission to the air carrier. Congress specifically authorized permissive refusals by air carriers; Congress did not say § 44902 was merely creating a defense. It is the plaintiff who carries the burden to show that § 44902(b) is inapplicable.

*Id.* The court, like other courts that have adopted the *Williams* test, stated that broad discretion is warranted because safety is the "first priority" in air traffic, as confirmed by the legislative history behind § 44902(b), and decisions implicating safety concerns "have to be made very quickly and based on limited information." *Id.* at 12, 14.

Ensuring safety in air commerce is similarly the primary objective of the Tokyo Convention. *See* S. Rep. No. 91-1083, 1970 U.S.C.C.A.N. at 3997 ("The principal purpose of the Tokyo Convention is to promote aviation safety . . . ."); Brief for the United States of America as Amicus Curiae at 2, *Eid*, No. 06-16457 (9th Cir. July 22, 2008) ("The 'principal purpose' of the Tokyo Convention was 'the enhancement of safety' aboard aircraft."). The drafters of the Tokyo Convention believed that giving immunity for "reasonable actions" would "enhance the proper attitudes and actions necessary to significantly contribute to safety of flight in international aviation." *Id.* at 3997-98. The drafters, like the courts that have interpreted § 44902(b), crafted a standard that takes into

account the demanding and time-sensitive nature of an aircraft commander's decisions. *See* Minutes, *supra*, at 223 ("While [the aircraft commander] would be comparable to the captain of a ship, he would have to deal with situations that might be more urgent . . . . The Conference should give some guidance to the aircraft commander who was given powers in the general interest. If nothing were included in the Convention on the point under discussion, the aircraft commander might have to hesitate and might, perhaps, do nothing in circumstances in which he should have acted.").[12]

At the same time, the drafters were certainly mindful of the rights of passengers to be free from unwarranted discrimination, and the majority correctly points this out. But safety of civil aviation was the principal objective of the Tokyo Convention. *See* Minutes, *supra*, at 156 ("[T]here has always been an attempt to keep in sight two objectives: *Firstly*, the safety of civil aviation, and, *secondly*, the guarantees for individual freedom. For that reason the word 'reasonable' had been introduced.") (emphasis added). The majority again cites to the same statement — this one made by the Dutch delegate — but comes to an odd conclusion, implying that the two objectives at all times and under all circumstances are to be weighed equally. Majority Op. at 10972. It is entirely possible for two objectives to exist but have one take precedence over the other; indeed, the language itself suggests this. No statement in the drafting history indicates that these two goals are equal in importance, although we must assume they are intertwined. There is no mention of "twin" or "dual" aims, only that of having two goals. An arbitrary or capricious standard, which grants deference to the aircraft commander to allow her to firmly and confidently make decisions concerning the safety of passengers but denies her immunity when those decisions are irrational and infringe on individuals' rights,

---

[12]This point is particularly true where the aircraft is actually in flight, a circumstance faced by Captain Swanigan and specifically addressed under the Tokyo Convention.

comports more closely with the intent of the Tokyo Convention.

It is important to state that deeming individual freedoms an important but secondary goal of the Tokyo Convention does not mean they are in danger of being violated anytime an aircraft takes flight. In describing the arbitrary or capricious standard, this court stated:

> The reasonableness of the carrier's opinion, therefore, is to be tested on the information available to the airline at the moment a decision is required. There is correspondingly no duty to conduct an indepth investigation into a ticket-holder's potentially dangerous proclivities. We believe this facet of the test provides a reasonable balance between safety concerns and the right of a ticket-holder to be free from unwarranted discrimination.

*Cordero*, 681 F.2d at 672. An arbitrary or capricious standard, while broad, thus has clear limits. Individuals' freedom will not be compromised in the pursuit of safety, as the majority seems to suggest.

In light of these shared objectives and considerations, the adoption of an arbitrary or capricious standard governing actions under § 44902(b) strongly supports the adoption of a like standard governing actions under the Tokyo Convention.

### 5.  *The Tokyo Convention Establishes an Arbitrary or Capricious Standard for Judging the Actions of the Aircraft Commander*.

In light of the foregoing, I believe an arbitrary or capricious standard is proper for judging the actions of an aircraft commander under the Tokyo Convention akin to that articulated in the § 44902(b) line of cases. An aircraft commander's actions are protected under the Tokyo Convention when the

belief warranting the taking of action is neither arbitrary nor capricious and when the action taken on the basis of said belief is neither arbitrary nor capricious. Such a standard meets the principal goal of promoting air safety as well as the goal of protecting the rights of passengers to be free from unwarranted discrimination. A negligence standard, on the other hand, will result in hesitation by the pilot in circumstances where he should have acted, second-guessing by courts, and the discovery of arguments which had escaped the attention of the aircraft commander. *See* Minutes, *supra*, at 223.

**B.   *The Diversion of the Aircraft Was Neither Arbitrary Nor Capricious*.**

Captain Swanigan's decision to divert the aircraft is analyzed under Article 6.[13] According to Alaska, Captain Swanigan had reasonable grounds to believe that Plaintiffs had committed or were about to commit acts jeopardizing safety, good order, and discipline on board, and that diversion of the flight was a reasonable and necessary measure under the circumstances. Plaintiffs argue — and the majority agrees — that Captain Swanigan's diversion may have been unreasonable because he acted without adequate inquiry into the nature of the first class disturbance, specifically: (1) when Ms. Cal-

---

[13]The making of a forced landing is an action explicitly contemplated by the Tokyo Convention. (*See, e.g.*, Tokyo Convention, *supra* note 2, art. 5(2) ("In the case of a forced landing . . . .").) However, it is unclear whether this act should be analyzed under Article 6 or under Articles 8 or 9. Neither Article 8 nor 9 speaks to whether the aircraft commander may make a forced landing in order to effectuate a disembarkation or a delivery. Even if the authority to disembark or deliver includes the authority to make a forced landing, it is unclear as to whether the aircraft commander may make a forced landing prior to making the decision to disembark or deliver. Here, it appears that Captain Swanigan did not make such a decision until the aircraft landed and he conferred with Ms. Calloway. Article 6 speaks more generally to the taking of reasonable measures that are necessary under the circumstances. Thus, Article 6 seems to be the better fit for analyzing Captain Swanigan's decision to divert the aircraft.

loway called Captain Swanigan to notify him that she was having a problem with some first class passengers and to request that security meet the aircraft in Las Vegas, Captain Swanigan agreed to call security without ascertaining the true state of events in the first class cabin; (2) when Ms. Calloway called a second time to say that she had lost control of the first class cabin, Captain Swanigan did not seek any explanation regarding the situation; and (3) at no time did Captain Swanigan look through the viewing port in the cockpit door to observe the first class cabin.[14]

But if Captain Swanigan's belief and action are to be judged on the basis of the information actually known to him at the time he formed his belief and took action — which is what would be required if we were to properly abide by an arbitrary or capricious standard and what the courts did in *Cordero*, *Newman*, and *Zikry* — the relevant inquiry focuses on the second phone call. It was during that call when Captain Swanigan "felt that there was a possibility that my airplane and my crew were in jeopardy" and decided to land the air-

---

[14]So what if under these circumstances Captain Swanigan did not look through the viewing port? Had he done so, was he to disregard Ms. Calloway's frantic call and assume all was well if he saw no commotion? As mentioned, regulations prevent him from exiting the cockpit. What would the majority require him to do next — conduct interviews of the crew and passengers via the interphone and peephole? Moreover, the Airline Pilots Association, International explained in its appellate *amicus* brief that looking out the port window requires one of the pilots to unfasten his safety belt, get out of the seat, and go to the cockpit door, while the other pilot must put on an oxygen mask and take command of the aircraft. Brief for the Airline Pilots Association, International as Amicus Curiae Supporting Appellee at 8, Eid v. Alaska Airlines, Inc., No. 06-16457 (9th Cir. Jan. 18, 2007). While this statement is not part of the trial record, we are not precluded from relying on our common sense understanding of commercial aircraft in flight and the duties of pilots. Finally, while the Federal Aviation Administration requires windows on all cockpit doors, there is no FAA regulation requiring pilots to use them when the pilot has to act quickly and believes that failure to do so will jeopardize the lives of passengers and crew.

plane.[15] What Captain Swanigan arguably would have known had he made further inquiries during the first call is irrelevant to the analysis. The court need only determine the facts that were before Captain Swanigan at the time he formed his belief and took action, and whether, on the basis of those facts, a reasonable fact finder could conclude that his belief or action was arbitrary or capricious. The district court correctly answered this question in the negative.

At the time Captain Swanigan received the second phone call, he was already of the belief that some first class passengers had given his flight crew some problems.[16] Ms. Calloway "came across very distraught; almost sounded like she was crying . . . and said, Mike, I've lost control of the first-class cabin." Captain Swanigan heard "a bunch of yelling and screaming" unlike anything he had ever heard in his 26 years with the airline. He confirmed with his first officer that the noise he was hearing was real, not imaginary. At that time, the difference in flight time between Reno and Las Vegas was approximately 25 minutes.

Based on these facts, Captain Swanigan believed that the passengers referenced in the first phone call — here, Plaintiffs — had committed or were about to commit acts jeopardizing safety, good order, and discipline on board. Captain Swanigan made the split-second decision that landing the aircraft was necessary under the circumstances, aware that any hesitation would soon make it impracticable to make an emergency landing in Reno. There was no affirmative obligation imposed

---

[15]Indeed, the first phone call ended with Ms. Calloway assuring Captain Swanigan, "I think I've got it under control."

[16]According to Captain Swanigan, "based on the information I got, it initially sounded like a minor disturbance . . . ." Whether this belief alone warrants calling security to the gate in Las Vegas is not a question before the court. Captain Swanigan's belief, based on the representations of Ms. Calloway, that some first class passengers had caused some problems, is but one factor in his calculus of the situation in the first class cabin at the time of the second phone call.

by the Tokyo Convention on Captain Swanigan to conduct a personal investigation given the facts before him, whether in the form of additional questioning of Ms. Calloway or looking through the window in the cockpit door. That the facts may not have been as Captain Swanigan believed them to be is immaterial, as hindsight and second-guessing have no place in the analysis.

For these reasons, Captain Swanigan's diversion of the aircraft was neither arbitrary nor capricious, and is protected under the Tokyo Convention as a matter of law.

The majority, on the other hand, concludes that the captain's decision to divert the plane must be presented before a jury. The panel cites *Cordero* to illustrate that this court has held that reasonableness should always be an issue for the trier of fact, thus making summary judgment improper. *See* Majority Op. at 10974-75. The majority correctly states this well-established legal principle. Of course, summary judgment may be precluded in this case only if reasonableness is indeed the proper standard by which to judge the commander's actions. I contend that it is not. Further, I find the panel's reliance on *Cordero* deficient because in that case, this court explicitly adopted the deferential standard from *Williams*. *See Cordero*, 681 F.2d 669 at 672. While the majority is correct to point out that the matter in *Cordero* went before a jury when this court overruled the district court's judgment notwithstanding the verdict, there was "ample evidence in the trial record from which the jury might have concluded that [the airline] acted unreasonably." *Id.* The record in the instant matter is entirely different from the one in *Cordero*. More importantly, we must remember that "unreasonably" in this context refers to a finding of unreasonableness *under the deferential standard established in* Williams. In other words, even after restricting the analysis to the "facts and circumstances . . . as known to the airline at the time it formed its opinion and made its decision" and granting the captain the right to make a decision without conducting an "investigation

into a ticket-holder's potentially dangerous proclivities," this court held that the captain in *Cordero* may have acted unreasonably. *Id.* It is not hard to see why. In *Cordero*, the plaintiff was accused of verbal misconduct while the plane was still on the ground. After the captain for Mexicana Airlines bizarrely announced that he would be making an unscheduled stop to pick up more passengers, several passengers on board the aircraft became upset. The plaintiff was accused of insulting the captain and crew and was subsequently not allowed to re-board. *See id.* Time was not as pressing — and the consequence of inaction not as significant — as it was for Captain Swanigan. Captain Swanigan faced a dramatically different situation. Here, the plane was mid-flight and the captain believed he needed to take action immediately. He received a call from a flight attendant unlike any other in his 26 years of flight experience. When examining the facts and circumstances as Captain Swanigan knew them at the time he needed to make his decision, I submit that no reasonable jury could find that he acted either arbitrarily or capriciously, as set by the Tokyo Convention.

### C.   *The Removal of Plaintiffs from the Aircraft Is a Triable Issue of Fact*.

I concur with the majority that Captain Swanigan's decision to remove Plaintiffs from the aircraft is a triable issue; however, I iterate that faithfully following the Tokyo Convention as well as this circuit's precedent would still require the commander's actions to be examined under an arbitrary or capricious standard, not a reasonableness standard. As I have articulated above, *Cordero* and *Newman* both adopt a deferential standard that restricts the analysis of the decision to the facts and circumstances known to the airline at the time the decision was made. *See Cordero*, 681 F.2d 669 at 672; *Newman*, 176 F.3d 1128 at 1131.

*Cordero*, as explained above, involved a passenger who allegedly became angry and insulted the captain because after

takeoff, the captain announced he would be making an unscheduled stop. The man was subsequently denied carriage onto the last leg of that trip. The plaintiff in *Newman*, a blind woman suffering from a heart condition, claimed she was denied entry onto a plane due to the airline's discriminating against her for suffering from observable disabilities. The commanders in both *Cordero* and *Newman* made decisions to keep the plaintiffs off their flights, and the decisions in both cases were made at a time when the planes were on the ground. The facts of those cases align more closely with the disembarkation of the passengers in the instant case; it is for that reason that I concur with the majority on this particular issue. But the instant case also includes facts that were not before the courts in the aforementioned cases, namely, that the plane was in the air and the crew had reported that the cabin was out of control, requiring the pilot to make an emergency landing. If safety is the primary concern — and the drafting history of the Tokyo Convention makes clear that it is — then deferring to the pilot when the plane is in flight would naturally lead to a very different result than deferring to the pilot when the plane is on the ground. For that reason, I maintain that: (1) the proper standard, even when sending the issue of disembarkation before a jury, is the deferential standard previously adopted by this court; and (2) while the issue that went before the jury in *Cordero* and *Newman* is akin to the disembarkation issue in the instant case, it is separate and distinct from the issue of diversion.

## III. *Defamation*

I concur with the majority in its holding that an assessment of the total circumstances surrounding the filing of the criminal complaint supports a finding that the allegedly defamatory statements made by Captain Swanigan and his flight crew were made in the course of the operations of disembarking Plaintiffs and are thus covered by the Warsaw Convention.

I also concur with the majority in its reversal of the district court's dismissal of Plaintiffs' defamation claim for the post-

disembarkation, in-flight announcement. Nothing in the Tokyo Convention suggests it extends to lawsuits filed by former passengers for harm that allegedly occurred after the plane disembarked.

## IV. *Plaintiffs' Motion to File a Supplemental Complaint*

I concur with the majority in affirming the district court's denial of Plaintiffs' motion to file a supplemental complaint as improperly brought under Rule 15(d).

Also, I agree that whether Plaintiffs were diligent and can now file a Rule 15(a) motion for leave to amend their complaint is a question for the district court judge.

Alternatively, the district judge may deem Plaintiffs as having waived their Rule 15(a) arguments by not addressing the applicability of Rule 15(a) in their opening or reply briefs despite being given notice by the district court and Alaska that the motion fell under that rule. *See Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) (noting that the Ninth Circuit "review[s] only issues which are argued specifically and distinctly in a party's opening brief.").

## CONCLUSION

For the aforementioned reasons, I respectfully DISSENT from the majority's adoption of a reasonableness standard in favor of a deferential arbitrary or capricious standard to judge the captain's flight decisions. Under the arbitrary or capricious standard, I submit that Captain Swanigan had no duty to conduct a thorough investigation prior to his decision to divert the plane, and could rely on the distress call he received from Ms. Calloway. I CONCUR with the majority in affirming the district court's dismissal of Plaintiffs' defamation claims based on the statements made in the terminal, and CONCUR with the reversal of the district court's dismissal of Plaintiffs' defamation claim for the post-disembarkation, in-

flight announcement. I CONCUR with the majority in affirming the district court's denial of Plaintiffs' Motion for Leave to File a Supplemental Complaint.